IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


BRUCE MASON,                          :
                                      :
              Petitioner,             :
                                      :
       v.                             :      Civil Action No. 21-864-GBW
                                      :
SCOTT CERESINI, Warden, and           :
ATTORNEY GENERAL OF THE               :
STATE OF DELAWARE,                    :
                                      :
              Respondents.[1]         :

---

Zachary Abele George, Hudson, Jones, Jaywork & Fisher, Dover, Delaware. Attorney for Petitioner.

Kathryn Joy Garrison, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware.  Attorney for Respondents.

---

## MEMORANDUM OPINION[2]

June 4, 2024
Wilmington, Delaware

---

[1] Warden Scott Ceresini has replaced former Warden Truman Mears, an original party to this case.  *See* Fed. R. Civ. P. 25(d).

[2] This case was re-assigned to the undersigned's docket on September 8, 2022.

Williams, District Judge:

Presently pending before the Court is Petitioner Bruce Mason's

("Petitioner") counseled Petition for a Writ of Habeas Corpus Pursuant to 28

U.S.C. § 2254.  (D.I. 1)  The State filed an Answer in opposition, to which

Petitioner filed a Reply.  (D.I. 15; D.I. 19)  For the reasons discussed, the Court

will deny the Petition.

## I.   BACKGROUND

> In the summer of 1992, R.R. was thirteen years old and living with her mother and stepfather. She ha[d] just completed the 7th grade. [Petitioner] worked with R.R.'s stepfather.
>
> On the night of the assault, [Petitioner] drove R.R., and her nine-year-old step-brother, L.R., over to his apartment under the pretense that the children could help him feed his dog. [Petitioner] also promised thirteen-year-old R.R. that she could drive the car on the way home from his house. Once inside [Petitioner's] apartment, R.R. became leery of [Petitioner] and asked her step-brother not to leave her alone with [Petitioner].
>
> [Petitioner] directed L.R. to play videogames in the living room while he lured R.R. into his bedroom under the guise of viewing photographs located there. L.R. tried to follow [Petitioner] and R.R. into the bedroom, but [Petitioner] shut and locked the bedroom door before L.R. could enter.
>
> At trial, R.R. testified that while locked in his bedroom, [Petitioner] kept attempting to enter her vaginally with his penis, and slightly penetrated her, but was too big. [Petitioner] then used his fingers and tongue to enter her. [Petitioner] also forced her to have anal sex. [Petitioner] asked R.R. to "suck his d___" and told her that he would

not let her leave the bedroom until she kissed his penis. Which she did.

At [Petitioner's] trial, L.R. testified, most convincingly, that he heard his sister crying as he stood outside the door trying to get inside the bedroom. [Petitioner] instructed L.R. to leave R.R. and him alone and to continue playing videogames. L.R. further testified that R.R.'s hair and clothing were disheveled and she was sniffling when she finally emerged from [Petitioner's] bedroom.

In the summer of 1992, [Petitioner] was nineteen-years old. [Petitioner] was 6 feet, 2 inches in height, and weighed 220 pounds. R.R. was much shorter and weighed 115 pounds. R.R. was no comparison in strength to [Petitioner].

R.R. told no one of the incident except her boyfriend. Her boyfriend kept R.R.'s secret for several months but finally told R.R.'s mother in November of 1992, who in turn called the police.

[Petitioner] admitted that he had taken R.R. to his home but claimed that he had not engaged in any sexual activity with R.R.

*State v. Mason*, 2019 WL 6353372, at \*1-2 (Del. Super. Ct. Nov. 25, 2019) (cleaned up).

On December 7, 1992, a New Castle County Grand Jury indicted Petitioner on three counts of first degree unlawful sexual intercourse, in violation of 11 Del. C. § 775 ("USI First Degree"), and one count of first degree kidnapping, in violation of 11 Del. C. § 783A. (D.I. 16-23 at 3-4) Petitioner was reindicted on

February 1, 1993 to add a fourth count of USI First Degree. (D.I. 16-21 at 28-30) As a result of the reindictment, the State entered a *nolle prosequi* for the counts in the original indictment. (D.I. 16-21 at 31)

On October 25, 1993, the State moved to amend the indictment. (D.I. 16-1 at Entry No. 18) The Superior Court granted the motion that same day. (*Id.*) The State sent a waiver of indictment and a copy of the superseding information to Petitioner's counsel. (D.I. 16-21 at 52-54) The superseding information changed the offense dates from "on or about August 1992" to "on or about June 27, 1992 to August 31, 1992." (D.I. 16-21 at 52-54) Petitioner executed the waiver-of-indictment form, consenting to proceed by the information. (D.I. 16-21 at 51-54)

Prior to trial, Petitioner filed a motion to have R.R. evaluated by a psychiatrist, which the Superior Court denied on September 17, 1993. (D.I. 16-1 at Entry Nos. 11, 15) On June 24, 1994, a Delaware Superior Court jury convicted Petitioner of three counts of USI First Degree. (D.I. 16-1 at Entry No. 63) The jury found Petitioner not guilty on the remaining USI First Degree count and could not reach a verdict on the kidnapping count. (*Id.*) The Superior Court declared a mistrial as to kidnapping, and the State later entered a *nolle prosequi* on that charge. (*Id.*) Petitioner filed a motion for judgment of acquittal and/or a new trial, which the Superior Court denied on August 16, 1994. (D.I. 16-1 at Entry Nos. 26,

3

33); *see State v. Mason*, 1994 WL 1877137 (Del. Super Ct. Aug. 16, 1994). On

August 19, 1994, the Superior Court sentenced Petitioner to 48 years of

imprisonment, suspended after serving 45 years, for three years of probation. (D.I.

16-1 at Entry No. 34) Petitioner appealed, and the Delaware Supreme Court

affirmed his convictions and sentences on May 16, 1995. *See Mason v. State*, 658

A.2d 994, 996 (Del. 1995).

On January 4, 1996, Petitioner filed his first motion for postconviction relief

pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"). (D.I.

16-9 at 10-13) The Superior Court denied the motion on April 11, 1996, and the

Delaware Supreme Court affirmed that decision on February 25, 1997. (D.I. 16-8

at 20-46); *Mason v. State*, 692 A.2d 413 (Table), 1997 WL 90780, at *2 (Del. Feb.

25, 1997).

On February 24, 1998, Petitioner filed a second Rule 61 motion, which the

Superior Court denied. (D.I. 16-16 at 159-64); *State v. Mason*, 1998 WL 449563

(Del. Super. Ct. Apr. 28, 1998). The Delaware Supreme Court affirmed that

decision on February 11, 1999. *Mason v. State*, 725 A.2d 442 (Table), 1999 WL

93283 (Del. Feb. 11, 1999).

Petitioner filed a third Rule 61 motion on February 20, 2019, and then filed a

Rule 35 motion for sentence modification on February 25, 2019. (D.I. 16-20 at 64-

4

86; D.I. 16-1 at Entry No. 75)  The Superior Court denied the Rule 35 motion on April 3, 2019.  (D.I. 16-23 at 7-10)  On November 25, 2019, a Superior Court Commissioner issued a report and recommendation that Petitioner's third Rule 61 motion be denied. *See Mason*, 2019 WL 6353372.  The Superior Court adopted the report and recommendation and denied the third Rule 61 motion on December 12, 2019.  (D.I. 16-20 at 42-43)  Petitioner appealed, and the Delaware Supreme Court affirmed the Superior Court's decision on December 16, 2020.  *See Mason v. State*, 244 A.3d 681 (Table), 2020 WL 7392348 (Del. 16, 2020).

In June 2021, Petitioner filed the § 2254 Petition presently pending before the Court.

## II.    GOVERNING LEGAL PRINCIPLES

### A.  Statute of Limitations

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003).  AEDPA prescribes a one-year period of limitations for the filing of habeas petitions by state prisoners, which begins to run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). AEDPA's limitations period is applied on a claim-by-claim basis, and the timeliness of a single claim will not render other later raised claims timely. *See Fielder v. Varner*, 379 F.3d 113, 122 (3d Cir. 2004). In addition, AEDPA's limitations period is subject to statutory and equitable tolling. *See Holland v. Florida*, 560 U.S. 631 (2010) (equitable tolling); 28 U.S.C. § 2244(d)(2) (statutory tolling).

## 1. Statutory Tolling

Pursuant to § 2244(d)(2), a properly filed state post-conviction motion tolls AEDPA's limitations period during the time the motion is pending in the state courts, including any post-conviction appeals, provided that the motion was filed

6

and pending before the expiration of AEDPA's limitations period. *See Swartz v. Meyers*, 204 F.3d 417, 420-24 (3d Cir. 2000). A post-conviction motion is "'properly filed' for statutory tolling purposes when its delivery and acceptance is in compliance with the state's applicable laws and rules governing filings, such as the form of the document, any time limits upon its delivery, the location of the filing, and the requisite filing fee." *Crump v. Phelps*, 572 F. Sup. 2d 480, 483 (D. Del. 2008). The limitations period is also tolled for the time during which an appeal from a post-conviction decision could be filed even if the appeal is not eventually filed. *See Swartz*, 204 F.3d at 424. The limitations period, however, is not tolled during the ninety days a petitioner has to file a petition for a writ of certiorari in the United States Supreme Court regarding a judgment denying a state post-conviction motion. *See Stokes v. Dist. Att'y of Philadelphia*, 247 F.3d 539, 542 (3d Cir. 2001).

### 2. Equitable Tolling

The one-year limitations period may be tolled for equitable reasons in rare circumstances when the petitioner demonstrates "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649-50. With respect to the diligence inquiry, equitable tolling is not available where the late filing is due to

7

the petitioner's excusable neglect. *Id.* at 651-52. Additionally, the obligation to act diligently "does not pertain solely to the filing of the federal habeas petition, rather it is an obligation that exists during the period [the petitioner] is exhausting state court remedies as well." *LaCava v. Kyler*, 398 F.3d 271, 277 (3d Cir. 2005). As for the extraordinary circumstance requirement, "the relevant inquiry is not whether the circumstance alleged to be extraordinary is unique to the petitioner, but how severe an obstacle it creates with respect to meeting AEDPA's one-year deadline." *Pabon v. Mahanoy*, 654 F.3d 385, 401 (3d Cir. 2011). An extraordinary circumstance will only warrant equitable tolling if there is "a causal connection, or nexus, between the extraordinary circumstance [] and the petitioner's failure to file a timely federal petition." *Ross v. Varano*, 712 F.3d 784, 803 (3d. Cir. 2013).

### 3. Actual Innocence Exception

A credible claim of actual innocence may serve as an "equitable exception" that can overcome the bar of AEDPA's one-year limitations period. *See McQuiggin v. Perkins*, 569 U.S 383, 392 (2013); *Wallace v. Mahanoy*, 2 F. 4th 133, 150-151 (3d Cir. 2021). A petitioner satisfies the actual innocence exception by (1) presenting new, reliable evidence of his innocence; and (2) showing "by a

preponderance of the evidence" that "a reasonable juror would have reasonable

doubt about his guilt[] in light of the new evidence." *Wallace*, 2 F.4ᵗʰ at 151.

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief

unless the petitioner has exhausted all means of available relief under state law.

*See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999);

*Picard v. Connor*, 404 U.S. 270, 275 (1971).  AEDPA states in pertinent part:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in
> the courts of the State; or
>
> (B)(i) there is an absence of available State corrective
> process; or (ii) circumstances exist that render such
> process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  This exhaustion requirement, based on principles of

comity, gives "state courts one full opportunity to resolve any constitutional issues

by invoking one complete round of the State's established appellate review

process." *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192

(3d Cir. 2000).

A petitioner satisfies the exhaustion requirement by demonstrating that the

habeas claims were "fairly presented" to the state's highest court, either on direct

appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989). If a petitioner raised the issue on direct appeal in the correct procedural manner, the claim is exhausted and the petitioner does not need to raise the same issue again in a state post-conviction proceeding. *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1997).

If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted. *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006). Such claims, however, are procedurally defaulted. *See Coleman*, 501 U.S. at 749; *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750; *Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims

10

unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.". *Murray v. Carrier,* 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[3] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States,* 523 U.S.

---

[3] *Murray,* 477 U.S. at 496.

614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual

innocence by asserting "new reliable evidence—whether it be exculpatory

scientific evidence, trustworthy eyewitness accounts, or critical physical

evidence—that was not presented at trial," showing that no reasonable juror would

have voted to find the petitioner guilty beyond a reasonable doubt. *See Hubbard v.

Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

## III. DISCUSSION

The Petition asserts the following three grounds for relief:

> (1)(a) Petitioner has newly discovered evidence
> demonstrating that R.R. was involuntarily committed to a
> mental health facility during his trial and the State violated
> *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to
> disclose this information to Petitioner at that time.
>
> (1)(b) Petitioner has newly discovered "exculpatory"
> evidence in the form of a statement provided by R.R. in
> June 2018 alleging that penetration never occurred and the
> prosecutors counseled her on how to testify. (D.I. 1 at 10-
> 13; D.I. 14 at 7-8)
>
> (2) the Superior Court lacked jurisdiction to try Petitioner
> because he did not knowingly, voluntarily, and
> intelligently execute a waiver of indictment. (D.I. 1 at 16-
> 20; D.I. 14 at 15-19)
>
> (3) Petitioner's sentence constitutes cruel and unusual
> punishment in violation of the Eighth Amendment and the
> Delaware Constitution (D.I. 1 at 20-21; D.I. 14 at 19-20).

The State argues that the Petition should be denied because: (1) Claims One (b), Two, and Three are time-barred; (2) Claim Two and a portion of Claim Three assert issues of state law that are not cognizable on federal habeas review; and (3) all three Claims are procedurally barred. (D.I. 15)

## A. Claims Two and Three: Cognizability

A federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims based on errors of state law are not cognizable on federal habeas review, and federal courts cannot re-examine state court determinations on state law issues. *See Estelle v. McGuire*, 502 U.S. 62, 67-8 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ; *Riley v. Taylor*, 277 F.3d 261, 310 n.8 (3d Cir. 2001).

In Claim Two, Petitioner contends that he was denied his constitutional right to be charged by indictment as required under Article I § 8 of the Delaware Constitution and the Fifth Amendment of the United States Constitution. (D.I. 14 at 19) Because the Fifth Amendment right to a grand jury indictment does not apply to State criminal prosecutions,[1] "the legality of an amendment to an

---

[1] *See Apprendi v. New Jersey*, 530 U.S. 266, 272 (1994); *Hurtado v. California*, 110 U.S. 516 (1884).

indictment is primarily a matter of state law." *United States ex. rel Wojtycha v. Hopkins*, 517 F.2d 420, 425 (3d Cir. 1975). Therefore, the Court will deny Claim Two for failing to assert an issue cognizable on federal habeas review.

In Claim Three, Petitioner contends that the imposition of three consecutive 15-year terms of incarceration constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution and Article I § 11 of the Delaware Constitution. (D.I. 14 at 19) To the extent Petitioner asserts a violation of the Delaware Constitution, he has presented an issue of state law that is not cognizable in this proceeding. To the extent he asserts a violation of the Eighth Amendment, Claim Three is cognizable. Nevertheless, as explained below, Petitioner's Eighth Amendment argument does not warrant relief because it is both time-barred and procedurally barred. *See infra* at Section.III.B.2. and D.1.

## B. Claims One (b), Two and Three: Time-Barred

### 1. Claim One (b): R.R.'s Statement

In a handwritten statement dated June 18, 2018, R.R. asserts that penetration never occurred. (D.I. 16-21 at 58-61) Petitioner contends that R.R.'s Statement

14

constitutes exculpatory evidence which "suggests that Petitioner did not commit the crimes he was convicted of."[4]  (D.I. 19 at 4)

When a habeas Petition alleges newly discovered evidence, "the filing deadline is one year from the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *McQuiggan*, 569 U.S. at 388-89; *see* 28 U.S.C. § 2244(d)(1)(D). While Petitioner does not specify when he learned about R.R.'s Statement, the Court assumes it was on the same date R.R. signed the Statement – June 18, 2019. Applying the one-year limitations to that date, Petitioner had until June 18, 2019 to timely file Claim One (b).  Petitioner, however, filed the instant Petition on June 17, 2021, two years after the filing deadline.  Thus, in the absence of any tolling, Claim One (b) is time-barred.

Statutory tolling does not render Claim One (b) timely.  AEDPA's one-year limitations period for Claim One (b) started to run on June 19, 2018  and ran for 246 days until Petitioner filed his third Rule 61 motion on February 20, 2019.

---

[4]Claim One (b) also asserts that R.R.'s Statement presents newly discovered evidence that the "State counseled [R.R.] about how to testify in order to make the State's case stronger so that [Petitioner] would 'get better'." (D.I. 1 at 11)  R.R.'s Statement, however, does not allege that the State counseled/coached  the content of R.R.'s testimony. (*See* D.I. 16-21 at 58-61)  Therefore, the Court will focus only on Petitioner's assertion that R.R.'s Statement constitutes a recantation of her testimony.

15

Petitioner's third Rule 61 motion tolled the limitations period through December 16, 2020, the date on which the Delaware Supreme Court affirmed the Superior Court's denial of the motion. The limitations clock resumed on December 17, 2020, and ran the remaining 119 days without interruption until the limitations period expired on April 14, 2021. Thus, even after considering the applicable statutory tolling, Petitioner filed the instant petition two months too late.

Equitable tolling also does not save Claim One (b). Petitioner obtained R.R.'s statement in June 2018, presented his argument concerning R.R.'s statement in his third Rule 61 motion that was filed in February 2019, and filed the instant Petition on June 17, 2021. Petitioner does not assert, and the Court cannot discern, that any extraordinary circumstance prevented him from filing a habeas petition containing Claim One (b) on a date closer to June 2018 or even closer to February 2019. Petitioner does not even offer *any* explanation for the delay.[5] To the extent Petitioner's late filing in this Court was due to a lack of legal knowledge or miscalculation of AEDPA's one-year filing period, such circumstances do not warrant equitably tolling the limitations period. *See Taylor v. Carroll*, 2004 WL

---

[5]In his Reply, Petitioner distinguishes the newly discovered evidence relied upon in Claim One (b) (R.R's Statement) from the newly discovered evidence relied upon in Claim One (a) (Discharge Summary), and only explains the reason for his delay in bringing Claim One (a). (D.I. 19 at 1-4)

1151552, at *5-6 (D. Del. May 14, 2004).  Given these circumstances, the Court

concludes that equitable tolling is not available to Petitioner on the facts he has

presented.

Finally, to the extent Petitioner's allegations of newly discovered

exculpatory evidence in Claims One (a) and (b) should be construed as an attempt

to trigger the actual innocence exception, it is unavailing – whether the allegations

are considered independently or together.  The jury convicted Petitioner of three

counts of first degree unlawful sexual intercourse: for placing his mouth on R.R.'s

vagina, for placing his penis in her mouth, and for penetrating her vagina.  (See

D.I. 14-1 at 53-54; D.I. 16-1 at Entry No. 23)  The jury acquitted Petitioner of

penetrating her anus. (*See id.*)  R.R.'s statement asserts that Petitioner "forced

himself upon [her]" and "attempted to penetrate both her vagina and anus," but

because of "his size," he "gave up after only 15-20 min[ute]s" and "no

penetration" occurred.  (D.I. 16-21 at 58-61)  Contrary to Petitioner's assertion,

R.R.'s Statement actually corroborates that the sexual assault occurred, and

explicitly identifies Petitioner as her assailant, even if she believes one of the

criminal acts was not completed.  Additionally, R.R.'s assertion about penetration

only concerns one of Petitioner's three convictions and, at most, suggests that he

was guilty of *attempted* first degree unlawful sexual intercourse rather than first

17

degree sexual intercourse due to his failure to penetrate her vagina.[6] *See* 11 Del. C.

§ 531.  And finally, the information in R.R.'s statement is not "new" because it is

consistent with R.R.'s trial testimony.  During trial, R.R. testified that Petitioner

"tried having sex with [her], but couldn't because he couldn't get it in." (D.I. 16-28

at 9)  When the State asked, "Did he get it in a little bit?", R.R. nodded and

responded, "Yes."  (D.I. 16-28 at 9-10)  While R.R.'s 1994 testimony and her 2018

written statement demonstrate that she disagreed with the jury over whether

Petitioner accomplished penetration, the statement is not new evidence of his

actual innocence.

Petitioner's assertion of newly discovered exculpatory evidence in Claim

One (a) fares no better.  Claim One (a) asserts that the State violated *Brady* by

failing to disclose the fact that R.R. was in a psychiatric hospital at the time of

Petitioner's trial because that information could have been used to impeach R.R.'s

credibility.  As discussed later in the Opinion, the mental health record concerning

R.R.'s admission at that hospital was not material.  *See infra* at Section III.D.1.

Since the standard for establishing materiality is less demanding than the *Schlup*

standard for proving actual innocence, the Court concludes that Petitioner's

---

[6]Notably, an "[a]ttempt to commit a crime is an offense of the same grade and
degree as the most serious offense which the accused is found guilty of
attempting."  11 Del. C. § 531.

assertions in Claim One (a) are not sufficient to establish a gateway claim of actual innocence. *See Mattis v. Vaughn*, 80 F. App'x. 154, 159 (3d Cir. 2003) ("The *Schlup* standard for proving actual innocence is far more demanding than establishing the existence of a reasonable doubt.").

In sum, Petitioner has not established "by a preponderance of the evidence" that a reasonable juror would have reasonable doubt about Petitioner's guilt in light of the information in R.R.'s Statement and the information in the Discharge Summary.[7] Accordingly, the Court will deny Claim One (a) as time-barred.

## 2. Claims Two and Three

In addition to denying Claim Two and a portion of Claim Three for failing to assert issues cognizable on federal habeas review, the Court also concludes that Claims Two and Three are time-barred. Petitioner does not assert, and the Court

---

[7]To the extent Claim One (a) and Claim (b) should be construed as asserting freestanding claims of actual innocence, the Court also concludes the Claims lack merit. The United States Supreme Court has not yet resolved if a freestanding claim of actual innocence is cognizable on federal habeas review. *See Reeves*, 897 F.3d 154, 160 n.4 (3d Cir. 2018). Nevertheless, assuming a freestanding claim of innocence should be considered to be cognizable, the Third Circuit has reasoned that "[f]ailure to meet the gateway standard is sufficient to reject any hypothetical freestanding actual innocence claim." *Bruce v. Warden Lewisburg USP*, 868 F.3d 170, 184 (3d Cir. 2017) (abrogated on other grounds by *Voneida v. Johnson*, 88 F.4th 233, 237 (3d Cir. 2023). As discussed here and in Sections III.B.I and III.D.1 Petitioner has failed to satisfy the gateway actual innocence standard for time-barred and procedurally barred claims, which means that he cannot satisfy the higher standard of proof for a hypothetical freestanding actual innocence claim.

cannot discern, any facts triggering the application of § 2244(d)(1)(B), (C), or (D) for Claims Two and Three.  Consequently, the one-year period of limitations began to run for these Claims when Petitioner's convictions became final under § 2244(d)(1)(A).

Pursuant to § 2244(d)(1)(A), if a state prisoner appeals a state court judgment but does not seek certiorari review, the judgment of conviction becomes final ninety days after the state appellate court's decision. *See  Kapral v. United States*, 166 F.3d 565, 575, 578 (3d Cir. 1999); *Jones v. Morton*, 195 F.3d 153, 158 (3d Cir. 1999).  The Delaware Supreme Court affirmed Petitioner's convictions and sentences on May 16, 1995.  Since he did not seek certiorari review of that decision, his judgment became final ninety-days later, on August 14, 1995.  However, state prisoners whose convictions became final prior to AEDPA's effective date of April 24, 1996 have a one-year grace period for timely filing their habeas applications, thereby extending the filing period through April 23, 1997.[8]

---

[8]Many federal circuit courts have held that the one-year grace period for petitioners whose convictions became final prior to the enactment of AEDPA ends on April 24, 1997, not April 23, 1997. *See Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001) (collecting cases).  Although the Third Circuit has noted that "[a]rguably we should have used April 24, 1997, rather than April 23, 1997, as the cut-off date, " *Douglas*, 359 F.3d at 261 n.5 (citing Fed.R.Civ.P. 6(d)), it appears that April 23, 1997 is still the relevant cut-off date in this circuit.  In the present situation, however, petitioner filed his petition well-past either cut-off date, rendering the one-day difference immaterial.

*See McAleese v. Brennan*, 483 F.3d 206,  213 (3d Cir. 2007);  *Douglas*, 359 F.3d at

261;  *Burns v. Morton*, 134 F.3d 109, 111 (3d Cir. 1998).

Thus, Petitioner had until April 23, 1997 to timely file Claims Two and Three.

      Petitioner did not file the instant Petition until June 17, 2020, almost 23 full

years after the applicable deadline.  Consequently, Claims Two and Three are

time-barred and should be dismissed, unless the limitations period can be

statutorily or equitably tolled, or Petitioner makes a gateway showing of actual

innocence. *See Jones,* 195 F.3d at 158; *see Wallace v. Mahanoy*, 2 F.4th 133, 151

(3d Cir. 2021) (explaining that actual innocence is an "exception to the statute of

limitations" rather than an "extension to the statute of limitations via equitable

tolling.").

      Statutory tolling does not render Claims Two and Three timely.  As

explained above, the first day of AEDPA's one-year statute of limitations period in

this case was April 24, 1996.  Since Petitioner filed his first Rule 61 motion on

January 4, 1996, the limitations period was actually tolled through February 25,

1997, the day on which the Delaware Supreme Court affirmed the Superior Court's

denial of that motion. *See Mason*, 1997 WL 90780, at *2.  The limitations clock

started to run on February 26, 1997, and ran for 363 days until Petitioner filed his

second Rule 61 motion on February 24, 1998.  The second Rule 61 motion tolled

the limitations period through February 11, 1999, the date on which the Delaware
Supreme Court affirmed the Superior Court's denial of that motion. The
limitations clock resumed on February 12, 1999, and expired on February 16,
1999.[9] Petitioner's third Rule 61 motion has no statutory tolling effect because it
was filed long after the expiration of the limitations period. Thus, even after the
applicable statutory tolling, Petitioner's filing of Claims Two and Three on June
24, 2021 is untimely.

Once again, Petitioner does not assert, and the Court does not discern, that
any extraordinary circumstance prevented him from presenting Claims Two and
Three before the expiration of the limitations period. Nor does he provide any
explanation for the 22-year delay in filing the instant Claims. Therefore, the Court
concludes that equitable tolling is not warranted for Claims Two and Three.

Finally, for the same reasons discussed with respect to Claim One (b), the
Court concludes that Petitioner has not presented a gateway claim of actual
innocence sufficient to excuse his untimely filing of Claims Two and Three. *See
supra* at Section III.A.1.

---

[9]The limitations period actually expired on February 14, 1999, which was a
Sunday. The next day, February 15, 1999 was President's Day, a federal holiday.
Therefore, the filing deadline was extended until the end of the day on Tuesday,
February 16, 1999. *See* Fed. R. Civ. P. 6(a)(1)(C).

Accordingly, the Court will also dismiss Claims Two and Three as time-barred.

### C. Claim One (a): Not Time-Barred

Claim One (a) asserts that the State violated *Brady v. Maryland* by failing to disclose that R.R. was involuntarily committed at the Rockford Center during his trial. According to Petitioner, after R.R. mentioned in her June 2018 Statement that she had been committed at the Rockford Center before Petitioner's trial (*see* D.I. 1-1 at 12), his counsel and an investigator undertook the process of trying to determine if any records of R.R.'s commitment still existed. In October 2018, Petitioner's counsel obtained verification that the records still existed, but did not obtain an actual copy of those records (in the form of a Discharge Summary) until January 2019. (D.I. 19 at 2)

The Discharge Summary reveals that R.R. was initially admitted at the Rockford Center due to "suicidal ideations," and Petitioner contends this information could have been used to impeach R.R.'s credibility. (D.I. 19 at 2) Relying on § 2244(d)(1)(D), Petitioner argues that the limitations period should not start to run for Claim One (b) until January 2019, when he actually obtained a copy of the Discharge Summary. (D.I. 19 at 2-3)

23

In contrast, the State contends that the limitations period should start sometime closer to June 2018, when R.R. provided her statement and mentioned that she had been placed at the Rockford Center prior to Petitioner's trial. (D.I. 15 at 13) The State argues that Petitioner could have obtained the Discharge Summary earlier than January 2019 had he exercised due diligence.

After considering both positions, the Court finds that Petitioner exercised reasonable diligence in seeking to obtain a copy of the Discharge Summary, and views the date on which Petitioner *learned* that the Discharge Summary still existed as the appropriate starting date for the limitations period rather than the date on which he actually *received* a copy of the Discharge Summary. Since Petitioner does not identify the specific day in October 2018 on which he learned the records still existed, the Court will use October 1, 2018 as the relevant date. Consequently, the limitations period began to run on October 2, 2018. *See Wilson v. Beard*, 426 F.3d 653, 662-64 (3d Cir. 2005) (Fed. R. Civ. P. 6(a) applies to AEDPA's limitations period). Applying one year to that date, Petitioner had to file his Petition by October 2, 2019. *See Phlipot v. Johnson*, 2015 WL 1906127, at *3 n. 3 (D. Del. Apr. 27, 2015) (AEDPA's one-year limitations period is calculated according to the anniversary method, *i.e.*, the limitations period expires on the anniversary of the date it began to run).

24

Although Petitioner did not file his Petition until June 17, 2021, Claim One
(a) is rendered timely through the application of statutory tolling. The one-year
limitations period for Claim One (a) started to run on October 2, 2018, and ran for
141 days until Petitioner filed his third Rule 61 motion on February 20, 2019. The
third Rule 61 motion tolled the limitations period through December 16, 2020, the
date on which the Delaware Supreme Court affirmed the Superior Court's denial of
the motion. When the limitations clock resumed on December 17, 2020, there
were 224 days remaining in the limitations period. Petitioner filed the instant
Petition 183 days later, on June 17, 2021. Thus, the *Brady* argument in Claim One
(a) is not time-barred.

### D. All Claims Are Procedurally Barred

Petitioner presented Claims One, Two, and Three in his third Rule 61
motion, which the Superior Court summarily dismissed as successive under Rule
61(d)(2). *See Mason*, 2019 WL 6353372, at *3, *6-7. The Superior Court also
denied Claim Two as time-barred under Rule 61(i)(1) and procedurally barred
under Rule 61(i)(3) because he failed to raise it on direct appeal or in a timely Rule
61 motion. *See id.* The Delaware Supreme Court affirmed that decision "on the
basis of and for the reasons state in the Commissioner's November 25, 2019

25

Report and Recommendation, as adopted by the Superior Court in its December 12, 2019 Order." *Mason*, 2020 WL 7392348, at *1.

Delaware Superior Court Criminal Rules 61(d)(2), (i)(1) and (3) and (d)(2) are independent and adequate state procedural rules precluding federal habeas review. *See Taylor v. May*, 2022 WL 980859, at *16-21 (D. Del. Mar. 31, 2022) (Rule 61(d)(2)); *Campbell v. May*, 2022 WL 3099185, at *11 (D. Del. Aug. 4, 2022) (Rule 61(d)(2); *Stanford v. Akinbayo*, 2021 WL 4263045, at *9 (D. Del. Sept. 20, 2021). By explicitly applying the procedural bars of Rule 61(d)(2), (i)(1) and (3), the Delaware state courts articulated a "plain statement" that their decisions rested on state law grounds. Thus, Claims One, Two, and Three are procedurally defaulted, and the Court cannot review their merits absent a showing of cause for, and prejudice resulting from, Petitioner's default, or upon a showing that a miscarriage of justice will occur if the Claim is not reviewed.

The procedural default analysis for *Brady* claims differs from that used for non-*Brady* claims. Therefore, the Court will address Petitioner's procedural default of Claim One (a) separately from his procedural default of Claims One (b), Two, and Three.

### 1. Claims One (b), Two, and Three

Petitioner does not assert any cause for his procedural default of Claims One (b), Two, and Three. In the absence of cause, the Court will not address the issue of prejudice. In addition, for the reasons already discussed, Petitioner's assertions of newly discovered evidence presented in Claims One (a) and (b) do not assert a credible claim of actual, factual innocence triggering the miscarriage of justice exception to procedural default doctrine. *See supra* at Section III.B. Therefore, the Court will deny Claims One (b), Two, and Three as procedurally barred.

### 2. Claim One (a)

In *Banks v. Dretke*, 540 U.S. 668 (2004), the Supreme Court opined that two of the three elements of a substantive *Brady* claim mirror the cause and prejudice inquiry for a procedural default, and proof of one is necessarily proof of the other. *Id.* at 691. A petitioner establishes a *Brady* violation by showing that: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or it had impeachment value: (2) the prosecution suppressed the evidence, either willfully or inadvertently; and (3) the evidence was material. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004). The method for excusing a procedural default is by demonstrating "cause and prejudice" and, within the context of a *Brady* claim, the suppression of

27

evidence by the State would be adequate "cause," while the non-disclosure of

"material" evidence would prejudice the petitioner. "Thus, if [the petitioner]

succeeds in demonstrating 'cause and prejudice,' he will at the same time succeed

in establishing the elements of his [*Brady*] due process claims." *Banks*, 540 U.S. at

691.

The State "does not dispute" that the information contained in the Discharge

Summary "appears to be *Brady* material" because it included potential

impeachment material. (D.I. 15 at 28) The State also asserts this "information was

known by the State and not disclosed to [Petitioner]." (*Id.*) Thus, the State

concedes – and the Court also finds – that Petitioner has established cause for his

default by satisfying the first and second components of a *Brady* claim.

In order to establish prejudice sufficient to overcome his default of Claim

One (b), Petitioner must demonstrate that the information in the Discharge

Summary was material for *Brady* purposes. A petitioner demonstrates the

materiality of suppressed evidence by showing a "reasonable probability of a

different result," which requires a showing that the suppressed evidence

"undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S.

419, 434 (1995); *see also United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008)

(explaining that materiality requires "a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different."). The "materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the State." *Johnson v. Folino*, 705 F.3d 117, 128 (3d Cir. 2013).

Petitioner contends that the State's "[f]ailure to disclose [R.R.'s] hospitalization denied [him] and the Trial Court the opportunity to investigate the competency of the witness to appear and testify." (D.I. 14 at 8-9) The underlying premise of Petitioner's *Brady* argument appears to be that R.R. falsely testified about the incident during the trial, and the information in the Discharge Summary concerning her "suicidal ideations during the week of trial" could have been used to impeach her credibility and veracity. (D.I. 1 at 14) Relying on a Second Circuit case, *Fuentes v. Griffin*, 829 F.3d 233 (2d Cir. 2016), Petitioner argues that the information in the Discharge Summary was material because it implicated R.R.'s credibility:

> As in *Fuentes*, here, [R.R.] and [Petitioner] were the only two people who were present and alone in the room where the incident allegedly occurred. The Jury's verdict of guilt against [Petitioner] could only have been returned if the Jury believed in the credibility of [R.R.] as she was the centerpiece of the State's case. This allegation was a delayed report to the police by a third party several months after the alleged incident. Significantly, there were no forensics of other physical evidence offered to corroborate

29

> her testimony. The facts presented to the Jury were strictly
> "he said/she said" as they were in *Fuentes*.
>
> Failure to disclose that [R.R.] was undergoing in-patient
> treatment for suicidal ideations during the week of trial
> denied [Petitioner] his Constitutional rights to due process,
> confrontation, and exculpatory evidence, and thereby
> eliminated his ability to challenge her credibility
> meaningfully.

(D.I. 1 at 14) Petitioner further argues that, "had the prosecution disclosed [R.R.]'s

admission into a psychiatric hospital, the defense would have been able to have her

records reviewed by an expert [...], and thus would have been able to present such

testimony regarding the credibility of [R.R.]'s testimony." (D.I. 14 at 14)

Although the Court is not bound by the Second Circuit's decision in

*Fuentes*, the Court notes that it is distinguishable.[10] The Third Circuit has noted

that "[s]uppressed evidence that would be cumulative of other evidence or would

be used to impeach testimony of a witness whose account is strongly corroborated

is generally not considered material for *Brady* purposes." *Johnson*, 705 F.3d at

128. In *Fuentes*, the issue was whether the sexual intercourse had been

---

[10]Both Petitioner and the State refer the Delaware Supreme Court's discussion of
*Fuentes* when it affirmed the Superior Court's finding that Claim One (b) was
procedurally barred. (D.I. 1 at 14-16; D.I. 15 at 30-31; D.I. 19 at 5-7) Given the
Delaware Supreme Court's explicit statement that it was affirming the Superior
Court's decision on procedural grounds, the Court does not view its discussion of
*Fuentes* as constituting an adjudication of Claim One (b) on the merits.

consensual, and "the witness's testimony [was] the only evidence that there was in fact a crime." *Fuentes*, 829 F.3d at 248, 259 ("Contrary to the Majority's depiction, the State's other evidence was not overwhelming  In only one respect was Fuentes's version contradicted by evidence other than the testimony of [the victim] herself.").  Here, in contrast, R.R.'s account of what occurred was corroborated by the testimony of R.R.'s stepbrother and Petitioner's friend, George English.  R.R.'s stepbrother testified that he was at the apartment with Petitioner and R.R. on the night of the incident, and stated: (1) Petitioner and R.R. went into the bedroom (D.I. 16-28 at 68); (2) Petitioner locked the door (D.I. 16-28 at 68); (3) the stepbrother "heard [R.R.] crying [and he] tried getting in" and "said, what is going on in there?" (D.I. 16-28 at 68); and (4) when R.R. came out of the bedroom, her hair was "messed up" and her eyes "looked like she was crying, and she kept sniffling" (D.I. 16-28 at 71).  Petitioner's friend, George English, testified that Petitioner "said [R.R.] sucked his dick." (D.I. 16-113 at 179)  English also testified that  R.R. told him that "Petitioner tried to get her to perform oral sex" (D.I. 16-16 at 120).

Moreover, "evidence of a witness's mental health will be material only if it undermines the witness's reliability or calls into question his ability to perceive, remember and narrate perceptions accurately." *Lesko v. Sec'y Penn. Dept. Corrs.*,

34 F.4ᵗʰ 211, 233 (3d Cir. 2022); *Wilson v. Beard*, 589 F.3d 651, 666 (3d Cir.

2009).  The information in R.R.'s mental health record from the Rockford Center

falls short of satisfying this standard.  For instance, the Discharge Summary

reveals that R.R. feared having to testify at Petitioner's trial, and indicates that her

suicidal ideations were related to, and/or cause by, the fear of going to trial and her

unstable living environment.[11]  The Discharge Summary states that: R.R. had never

---

[11]The Court finds the following excerpts from the Discharge to be relevant to the materiality issue:

> BRIEF HISTORY:  The patient's chief complaint was "guys."  She had suicidal ideations.  She has an unstable living situation.  [...] Recently, she has been staying with her 18 year old sister, who told her to leave.  She has to attend a rape trial, and she was frightened by the trial.  She was considered at high risk for self-harm behavior.  **She had called the police department threatening suicide. She called the police because she didn't know what else to do.  She was aware that her statement would get her into the hospital because she was so desperate.**  [...] She has never attempted suicide and never hurt herself. [...]  She denies hearing voices or having plots against herself.  [...]  She has been sexually active with serial monogamy.  She reports other sexual abuse although she sees herself as happy.

> PAST PSYCHIATRIC HISTORY:  She has never been in the hospital before but has been in counseling with [KJ] two or three times.
>
> *          *          *

32

been hospitalized prior to this particular admission at the Rockford Center; there were no signs she was suffering from depression; no medications were used during treatment; and R.R.'s symptoms improved after she testified; and R.R. was discharged after four days of treatment. (D.I. 1-1 at 7) Given the extremely short amount of time R.R. was at the Rockford Center and the relatively rapid resolution

---

MENTAL STATUS EXAMINATION: [...] There were no signs of depression. [...] Her patterns of thought were logical and relevant. There were no preoccupations or ideas of reference or influence. [...] All tests of memory were good. Impulse control is somewhat undermined by her life situation and tests of judgment were somewhat impulsive.

\*          \*          \*

HOSPITAL COURSE: The goals of the hospitalization were for patient to identify sources of her depression and suicidal thoughts and develop positive alternatives. She was seen on the adolescent unit in individual psychotherapy and attended all the therapies of the adolescent treatment center. The prosecutor's office was permitted to visit her. No medications were used.
Patient was to go to Court to testify in the rape trial on 6/21/94. She said that she did well in Court. She was happy about it. The only issue that remained was where she could safely live.

\*          \*          \*

DISCHARGE STATUS: Somewhat improved. The patient was no longer stating that she was suicidal.

(D.I. 1-1 at 7-9) (emphasis added)

33

of the issues which initially caused R.R. to threaten suicide, Petitioner has failed to

demonstrate how the evidence concerning R.R.'s mental health in the Discharge

Summary calls into question R.R.'s "ability to perceive, remember and narrate

perceptions accurately."  While the Discharge Summary's assertion that R.R.

called the police department threatening suicide because she knew the threat would

"get her into the hospital" may have provided a basis for impeaching R.R.'s

reliability,[12] the impeachment value of that information is not material because the

corroborative testimony provided by R.R.'s stepbrother and George English was

"strong enough to sustain confidence in the verdict."[13]  *Smith v. Cain,* 565 U.S. 73,

76 (2012).

In sum, after reviewing the information in the Discharge Summary in

context with corroborating testimony that was presented during Petitioner's trial,

the Court concludes that Petitioner has failed to demonstrate a reasonable

probability that, had the information in the Discharge Summary been disclosed to

Petitioner during his trial, the result of the proceeding would have been different.

Thus, the information in the Discharge Summary was not material and does not

---

[12]The Discharge Summary's description implies that R.R. may have exaggerated
her distressed state in order to gain admission to the Rockford Center which.

[13]Nevertheless, the Court will grant a certificate of appealability on this issue.  *See
infra* at Section IV.

34

establish actual prejudice sufficient to overcome Petitioner's default of Claim One

(a).  Nor has Petitioner demonstrated that the miscarriage of justice exception

applies.  Accordingly, the Court will deny Claim One (a) as procedurally barred.

## IV.   CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also

decide whether to issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2

(2011); 28 U.S.C. § 2253(c)(2).  A certificate of appealability is appropriate when

a petitioner makes a "substantial showing of the denial of a constitutional right" by

demonstrating "that reasonable jurists would find the district court's assessment of

the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also*

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Additionally, when a district court

denies a habeas claim or petition on procedural grounds without reaching the

underlying constitutional claims, the court is not required to issue a certificate of

appealability unless the petitioner demonstrates that jurists of reason would find it

debatable: (1) whether the claim or petition states a valid claim of the denial of a

constitutional right; and (2) whether the court was correct in its procedural ruling.

*See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief.

Reasonable jurists would not find this conclusion to be debatable with respect to

Claims One (b), Two, and Three.  Accordingly, the Court will not issue a certificate of appealability for Claims One (b), Two, and Three.

As for Claim One (a), while the Court concludes that R.R.'s testimony was sufficiently corroborated such that there is not a reasonable probability that any further impeachment using the information in the Discharge Summary would have changed the outcome of Petitioner's trial, it also concludes that "reasonable jurists could debate" that finding.  *See Slack*, 473 U.S. at 484.  Accordingly, the Court will issue a certificate of appealability for Claim One (a).

## V.    CONCLUSION

For the reasons discussed, the Court will deny the instant Petition without holding an evidentiary hearing.  The Court declines to issue a certificate of appealability for Claims One (b), Two, and Three, but will issue a certificate of appealability for Claim One (a).  The Court will enter an order consistent with this Memorandum Opinion.[14]

---

[14]The Court's adjudication of the Petition moots the need to hold an office conference that Petitioner requested.  (*See* D.I. 21)

36